Good morning. May it please the Court, Philip Schuller for Petitioner-Cross Respondent, Energy Mississippi. We'd like to focus on four major issues here today. First, the Section Second, the recent decision of the First Circuit Court of Appeals in NLRB v. NSTAR Electric, about which the Board submitted a 28-J letter, the appropriate standard of review for this case, and finally, the issue of latches, which only we state is an issue in this case. The other side does not consider it an issue, but merely states after a 12-year delay, it's regrettable, but of no consequence. First, I would like to talk to you about the 211 Supervisory Standard, pre- and post-Oakwood. Only once since the Board has been deciding cases has the Board said yes when considering employers' argument that electric utility dispatchers are supervisors under the NLRA. Eight courts of appeals have rejected, denied enforcement to the Board's orders, finding them not to be supervisors and, in fact, finding them to be supervisors. Those cases are set out at footnote 28 of our original brief. The long decision in this 50 years occurred in 1983 in Big Rivers. We have set out in our brief all the machinations that the Board has gone through over the years since Big River, but the Board has tried to have categorical exclusions of certain categories of supervisors and has been rejected by the Supreme Court twice as those holdings were too narrow and not consistent with the text and purposes of 211 of the statute, and this Court in Energy Gulf States found the same thing. Now the Board is back here, 15 years after Energy Gulf States found supervisors under the standard enunciated by the Board in 2006 in Oakwood health care, but Oakwood's majority adopted and quoted from, at page 691 of the majority opinion, the Fifth Circuit's supervisory definition for responsible direction first announced in KDFW television involving a television station's directors and producers, a 1986 case, and later adopted with the same page reference in Energy Gulf States at page 209. The Oakwood majority quoted from, followed, and expressly adopted Fifth Circuit law. Oakwood did nothing to change this circuit's Energy Gulf States precedent. What circuit since the Oakwood trilogy has said that the test didn't change, that it didn't change, has any circuit said there was no change in the agency's interpretation? The Fifth Circuit is the only one. But Gulf States preceded Oakwood trilogy. That's right. So has any? No. No. Not that I'm aware of. So in a way, when you look at the span of 50, 70 years, courts, including ours, and the Supreme Court are just as responsible for the difficulty of giving a specific test for the managerial position. It isn't just the NLRB. No one's been able to do it. And as I understood the history, and it is a history you're not to blame for, and maybe courts have more blame, but Oakwood is the NLRB's effort responding to the Supreme Court Kentucky case to say, do it better. And so then every court that's looked at that trilogy has said they did change the test. So I guess, let me frame that as a question. Is your position before us that the test didn't change, so we're controlled by Gulf States? Is your position before us that the test did change, you met your burden, and therefore there is no substantial evidence that the NLRB relied? Or is your position that the test changed in part as to direction, but maybe not other parts such as assignments? Those to me seem to be the full orbit. The Gulf States, of course, only dealt with responsible direction. I know. Not assignments. So what's your best argument to us? The test didn't change, therefore we're controlled, we have no discretion as a panel? The test did not change from Entergy Gulf States. But Oakwood Trilogy comes in, when you read those decisions, they're clearly articulating a new test, and every court that's looked at them has said so. I don't think any scholar hasn't even said so. Well, when you look at, when you look at, when you look at Oakwood and what they said in Entergy Gulf States, they adopted, they adopted the Fifth Circuit's standard. KDF. In KDFW, they adopted it, and that was adopted by Entergy Gulf States. They adopted the same standard. They used the very word, adopt. We adopt the standard in KDFW. So, and they quoted from it, they set— But the legal accountability is a test that courts are applying pretty rigorously around the country. That's a new test. I don't know what courts other than NSTAR have specifically— What about the Frenchmen? Is that the Sixth Circuit? That's an earlier case, I think. Frenchtown? No, I don't think so. You know, it's important to take a step back and realize that the Oakwood board, the Oakwood decision was decided by a three-person Republican majority appointed by George W. Bush. And it's ironic that they're saying here, they're relying on Oakwood to support a narrow result opposite to that the two dissenters in Oakwood argued was sure to follow, extension of supervisory authority to everybody on the, on the, on the factory floor. Well, that hadn't happened. The prediction at page 700 and 701 of the dissent is that a mass exclusion of a large number of professionals from the Act's protections under the majority at Oakwood has not happened. In fact, to the contrary, in the decades since Oakwood, the subsequent boards, including this board in this case, has given the protection of the Act and unanimously found all employer-advocated supervisors to be employees. That's in our appendix. Sixty-one to nothing in post-Oakwood decisions, the board has found them not to be supervisors. If one was to apply a disparate impact analysis to the board's post-Oakwood decision, finding various employer-advocated supervisors to be employees to this statistical result, one would have to find it was just intentional and designed to reach a predetermined result. And we contend. I'm not sure what your argument is right now. You're relying on, you're relying on statistical comparisons? What's your legal argument? Well, the legal argument is, You're controlled by Gulf states because the test didn't change. Yes, because they expressly adopted KDFW, the Gulf states applied KDFW, and Oakwood specifically adopted and quoted from that standard. Let's say we And that didn't change. And we think that there's a refined or enhanced test. Do you still feel that there's no substantial evidence supporting the board's conclusion that you didn't meet your burden that that test was met? Yes, we do. You do. Okay. We contend there's no substantial evidence. Okay. So let's, do you want to talk about direction or do you want to talk about assignments? Well, we'll talk about direction if you want. I mean, under responsible direction, we think our best evidence is in multiple outage situations. We submitted an exhibit, Petitioners Exhibit 48 and 49, which is the decision tree that resource manager Alan East, an electrical engineer, and John Scott, the head of the Distribution Operations Center, also an electrical engineer, testified about these decision trees and the judgments that they have to exercise in making assignments to employees in multiple outage situations and directing people. I think what you've got to point us to, and this is helpful, I appreciate our exhibit site, what's the example of personal accountability, in other words, a dispatcher being disciplined because of the conduct of a subordinate, a field employee? What's your best example? I don't think discipline is necessarily the answer. But I'm just, if I'm right, on the assumption, what's your best example? Okay. Our examples are John Scott issued a collective warning to dispatchers when the crew's power restoration times lagged behind those of other networks. Where's that? Original brief, page 33, record citations accompanying that. Dwayne testified that dispatchers were counseled for failure to effectively direct field employees in timely and safe power restoration. That's in the original brief at 30 and 31, record citations accompanying that. John Scott testified that dispatchers were accountable for failure to sign enough employees to trouble, resulting in a lengthy power outage. That's page 33 of the original brief. Page 22 of the reply brief, record citations accompanying those. Power, they receive larger bonuses. If they're successful in reducing their power restoration times, so they're more highly compensated, receive higher raises. If they're successful in directing their employees, which is one thing. Senator Flanders, and this is footnote 27 of Oakwood, when Senator Flanders was introducing the Responsible Direction Standard Amendment to Section 211, that's one thing he cited was how important it was that they were responsible for the outcome of what people below them did. If they were successful in managing those people below them, well, here, they get rewarded if they did. And they say, and I should point out that they say that that was a unilateral change that we made while this case was pending in 2006 when we removed dispatchers from the unit, but we cite to this Court's Arkema decision and others that, you know, and they say we did that at our apparel, but we were just following Andrew G. Gell State's . . . Is there an example when they say rhetorically in their brief, well, is, you know, one would think a manager could say, you take, you, field employee, take this plum job, or you take this bad one, because I don't have confidence, or I want to test you, so that's an example of managerial prerogatives. Yes. Yes. Well, the decision tree particularly goes into that because when they're making these assignments in multiple outage situations, okay, they say, we've got multiple outages here. Who do I send? Do I send this person here or this person here? Do I send a line crew because this has, the transmission lines are at issue or whatever? Or do I send, do I need heavy equipment on this? Do I send a serviceman because it's an issue in the, in the, in the . . . They're not . . . . . . substation. They're not consulting. For those assignments, they're not consulting, oh, this affects this many houses in this circumstance. Oh, sure they are doing that, too. If it's a . . . But if they're consulting prearranged instructions that, that, that's been a factor courts look at to say it isn't discretionary . . . Yeah. Right? So if they have a decision tree or standard operating procedures, then are they more like a yellow cab dispatcher? Oh, we got a call. They need a cab. Who's next in line and who's nearest? Those are easy sort of formulaic . . . All respect, every court that's dealt with dispatchers recognizes they, they aren't yellow cab dispatchers. They have enormous responsibility for the safe and restoration of the, of the, of the power and enormous responsibilities for the, their employees. Right. These are not simple decisions . . . No one's denying, no one's denying that energy dispatchers have massive, no one in this city ever could, vital roles, but the question is, are these people acting with the discretion of a supervisor or are they following company plans, oh, that blocks out, therefore they're next or a hospital's there, that's priority? Or can they just say, you know, I want to do this part of the city first? That would suggest great discretion. Yes, Your Honor. Well, if, if you read Alan East's testimony and John Scott's testimony cited in our brief at, in our reply brief, particularly at pages, I think it's 14 through 23, you'll see how much discretion they have. And, Your Honor, I really have to switch, if I can, to the issue of latches right now because I need to get this in, in my argument in chief or I won't be able to, to get to it later. And it's been, as we say, 12 years since, since this case was filed, the unit clarification petition in August 2003. And to provide the court with context, consider the NSTAR case, if you would, upon which the board relies. In that case, within less than two years from the original filing of the board petition, the circuit court had issued its final ruling. Here it has taken 12 years and we're not done yet. If we have a remand in this case, there's going to be further hearings on the remedial, what remedial action would be required in this case. The board's responsible for all the significant delay. The board says this, this delay is regrettable, calls 12 years regrettable. I dare say that if this case does not warrant the application of latches, there is no, there is no reason that this, this is even included as a defense pursuant to federal law. And this case, when we had the original hearing in the case in 2003 and went back on remand after Oakwood in 2006, there were tremendous technological changes in that three-year period, particularly with regard to the AMFM system, and the testimony reflects that in 2006. Well, the development since 2006, the nine years since 2006, technology and regulatory environment under FERC has changed drastically. There is no way the board could decide the remedial issues in this case on a remand without further hearings to address those significant changes. And I assume I'll have a chance to talk some about NSTAR on my . . . It was Pete. Okay, good. Sorry. Go ahead. That's fine. That's fine. Good morning, Your Honors. My name is Elizabeth Heaney, and I represent the National Labor Relations Board, which is seeking enforcement of its order today requiring that the dispatchers be returned to the unit and that the employer bargain with the union as their representative. And I'll start off with addressing, first of all, Your Honors' question about the is the standard here? The standard here is the standard that the board announced in 2006 in Oakwood. It is not the standard as announced in Entergy Gulf States. The board did rely upon Entergy Gulf States, or it relied upon KDFW, which Entergy States did rely on. But if you look at the language, you see that Oakwood expanded upon what it meant to be accountable or answerable. Initially in KDFW, which Oakwood cited, it stated that to be answerable for the discharge . . . responsible . . . workers responsibly direct if they're answerable for the discharge of a duty or obligation or accountable for the work product of the employee he directs. Oakwood expanded upon this and said you must be answerable and, quote, some adverse consequence may befall him if the tasks performed by the employee are not performed directly. And that's at page 692 of the . . . Stepping back a little, does the record support that Entergy only removed these people when essentially we told them to? So there is a tension, in other words, in Gulf States 1. We said that, you know, and then now 14 years later, they're back before our court and our instruction to them is going to support an unfair labor practice? Well, Entergy filed a unit clarification petition, and while that was pending, it unilaterally removed the dispatchers from the unit. And board law is quite clear . . . Well, that's what they've done here, but that was in light of our ruling telling them that's appropriate to do. Again, board law is quite clear. When you act while a unit clarification petition is pending, you must accept the consequences of your behavior. So they acted . . . That's an answer. But, Your Honor . . . They acted in light of our interpretation. But every, every supervisory case is different. It is very fact-specific. So if you have found that in Entergy Gulf States that the dispatchers in Louisiana did and performed certain tasks, that doesn't necessarily mean that the dispatchers here in Mississippi . . . But, but, but the NLRB said the facts of these particular dispatchers hadn't changed. So we're looking at the same facts. Your position is that in 2006, the tests changed. Isn't that your position? Yes, Your Honor, the tests . . . Okay. Well, then let me ask you just a very narrow question that I don't see briefed. Why would the scope of your request for relief extend to any time before 2006? Um . . . If the test changed and you're relying on the change in test, they couldn't have effectuated an unfair labor practice until 2006. But does Your Honor's question seems to assume that the Board would have found in line with Entergy Gulf States, that the Board would have decided that . . . Well, the Board admits in Oakwood, the Trilogy and every court that's interpreted it said that's when the test changed. You got Kentucky . . . Yes, the . . . You were told to change it. You enhanced it. So I'm asking you, how could it have been an unfair labor practice until you enhanced the test? Your position before us, is there a violation of the enhanced test? Correct, Your Honor, but I, again, fall back on the position that every supervisory test is factually different. So, if the Board had received Entergy Mississippi in front of it and had not announced the Oakwood standard, who's to say that they would have come out differently? We're bound. We would be bound at that point. But you . . . There's no agency reinterpretation. But I don't . . . That's assuming that the facts in Entergy Gulf States, but I don't think . . . Well, the NLRB, okay, then you tell me, your position now is not the NLRB's position? Your position is the facts in this record describe job description for dispatchers that were not the facts in the earlier Gulf States case? Is that your position, yes or no? I think that there are factual differences between Entergy Gulf States and Entergy Mississippi. As to the job description for dispatchers? That Entergy Mississippi never produced a job description, so I have nothing to compare it to. They produced a job description . . . Then how can you say to me, how can you say to me the facts before the Board are different? Just by looking at the facts of what was listed in the facts for Entergy Gulf States versus what was listed for Entergy Mississippi. For example, in Entergy Gulf States, the court found that the dispatchers there were able to send the employees, hold them over for sure. Here the Board found they don't have that responsibility. In Entergy Gulf States, there is testimony about the dispatcher's ability to reward and discipline the employees, but here we don't have that. Those are factual differences between the two cases. Don't the supervisors have the right to deviate from the decision tree if work is needed in a different area? They're not bound by the decision tree. What the record shows is that when the dispatchers are making their decisions and they're moving field employees around, they are doing so in accord with who is the employee assigned to that geographical area that day. Who's the closest, warmest body that I can grab and move to this area? They're not assessing that field employee's skills. They're not saying, oh, this lead man, Bob, is very . . . has incredible skill when it comes to that. Can't they redirect the workers? I'm sorry? Can't they redirect the work on their own? The Board agrees that the dispatchers direct the employees if the direction is not responsible. But that's an assignment function. What cases interpreted Oakland's personal accountability to apply not to direction but to assignment? What's your best case for that? Frenchtown. Frenchtown? Frenchtown. And then also for assignment for . . . if you look at Mars Home, that is a Second Circuit case where the . . . when the assistant managers had to call out the RAs, when the managers had to move the RAs to adjust staffing shortage, they simply just moved the most junior person first. So you think the Oakwood Trilogy is modifying, not just the . . . not enhancing and defining the word responsible, both as to direction but also as to the other functions? Oakwood was quite clear in that it was reacting to the Supreme Court's request for the Board to clarify responsible direction, assignment, and what it means to do both of those functions with independent judgment. But responsible direction doesn't modify assignment, and they're . . . right? Am I right? Correct. Right. They're two separate functions. And I thought the Oakwood Trilogy's personal accountability test was built on the word responsible. I didn't understand that you also have to show . . . you can only show someone's a supervisor as to assigning people if you point to personal accountability. Yeah. I guess I must have misled you or misunderstood your question. Personal accountability comes into play during responsible direction. Right. So therefore, there is no enhanced test under Oakwood for assignment. So the question is the one that it's always been, which is we look and see . . . the question you were just asked a minute ago . . . do they assign duties, tasks, locations . . . Correct. . . . with supervisory type discretion? With independent judgment. Okay. And where in the NLRB's ruling does it discuss the substantial evidence that shows that they do? In this case. In this case. Right. Where in their ruling? They . . . where they did not . . . in the board's ruling found that they did not assign . . . they did not . . . are you responsibly direct or would you . . . Forget responsible direction. Okay. Where in the board's ruling does it discuss that there was no substantial . . . that the employer hadn't met their evidence about discretion on assignments? Well, when we can talk . . . I'll take it in turn and first talk about assignment to a time, which is the first one. Yes. And the board there talked about, well, the managers . . . or to scratch that, the dispatchers can assign employees overtime. They can request it. They cannot require it. And it's not a supervisory function if it's simply requested but not required. And the evidence that the company put forward to discuss about assignment to a time was not sufficient. If anything, it was equivocal and completely lacking in specificity . . . Isn't there evidence that was never . . . never part of the board's opinion that the dispatchers can redirect workers in a time of crisis or trouble? They can redirect the assignment, pull them off of one job location, send them to another? That was never . . . that was never given credence in the opinion. Well, when the board . . . now that goes to assignment to a place using independent judgment and whether it's multiple locations or just one trouble spot, the dispatcher is still working or hamstrung by the same company protocol, nor is the ham . . . is the dispatcher . . . by that, I mean that they have to start with the largest outage and work their way down. Is that a finding in the board's decision? The board did discuss that in the board's decision, correct, yes. And that the . . . they're not looking at the skills of the dispatchers when they're sending them. They're not doing an evaluation, unlike in Oakwood when the charge nurse is determining what nurse to assign to a patient and they're taking into consideration that nurse's particular skills and proficiency in an area. Here there's no evidence in the record that the dispatchers specifically consider those particular skills of the employees whom they're assigning to a place. Part of the reason I guess I'm pressing you on this is you . . . you were the one . . . you 28J'd the NSTAR decision. Correct, Your Honor. So you know it pretty well. Yes. Okay. Footnote 10, talking about this case, says the board has explained in Entergy, Mississippi that electrical dispatchers did in a sense assign field employees to places by telling them where to go. Entergy, Mississippi did not resolve, however, whether that was assignment or ad hoc direction. Correct. I mean . . . Okay. Okay. So . . . So wouldn't that imply that at least the First Circuit doesn't think the board in this case addressed that issue? No. The board addressed all three assignments. They addressed time, significant overall duties, and they addressed place. So . . . Distinguishing between ad hoc managerial power . . . Yes. Absolutely. Because the way they addressed assignment of significant overall duties is they . . . the dispatchers are rerouted from their regular work to trouble work. That's simply a reordering of their daily assignments and . . . It's not independent judgment. It's not. That is . . . Well, they didn't even get to independent judgment at that point because they didn't even find the assignment of significant overall duties. And since there was no assignment of significant overall duties, the board simply didn't have to consider whether it was done with independent judgment. Before you run out of time, I think you'd best address the latches issue, what in the world took the board so long? Right. Well, in order to show latches, the company had to show both a lack of diligence on the board side and prejudice to the company. And just starting off with the lack of diligence, the board's use of the phrase regrettable is not a careless use and it's not a tossed about term. It's truly regrettable. But it was largely due to the evolving state of the law. Just in the conversation we've had here, you can see how difficult an issue it is and the board grappled with it for quite a bit of time. And then after they issued their decision, we unfortunately had the Noel Canning delay, which contributed to the delay, but was also an issue that had to be addressed, obviously, because it went to the board's ability to even issue a decision. You're saying that's very different than the criticism we authored in Gulf States where it was just a vacillation? You're saying here we have an intervening Supreme Court decision? We have Kentucky River that came down telling the board you need to look very closely at these issues. And during the Kentucky River process, the board examined many amici briefs and looked very closely at the issue. This probably won't be the end of the story either. It's just inherently a hard statutory term. It's very hard and, again, the board is the body that's most entrusted with determining labor issues. That's their expertise. And in Oakwood, when they expanded upon or elaborated upon the definition of responsible direction, they're acting as if that agency should act, that they've examined the issues in the workplace and they're bringing their expertise to defining that term. And also, with regard to the second, if I may, Your Honor, just the second prong of latches is you have to show prejudice, and I think that vague mentions of regulatory changes that have wreaked havoc on the company does not show the specific prejudice that is necessary for latches. All right. Thank you. Thank you. Sharing a time with Ms. Leyland? Yeah. Good morning, Your Honors. My name is Nora Leyland and I represent the intervener unions in this case. And I would like to respond to a few questions. I would like to respond to a few questions that Judge Higginson directed to Ms. Keeney. The question of responsible direction, you're correct, doesn't modify assignment, but independent judgment applies to assignment as it applies to all of the . . . But do you agree with her that the board never got to independent judgment? I think that . . . Well, the question I'm going to say, what I'd like to say is what the board's ruling is, well, in Oakwood, on independent judgment as to assignment, is that you have to assess the individual, the skills of the individual, and match those to the task at hand. And that is not done here. And the board has a lengthy discussion, although they never say independent judgment. They have a lengthy discussion in the decision about the fact that dispatchers don't assess the individual merits of people, field employees, when they assign them to a place. And that is because the record supports the fact that the field employees' actual supervisors are the ones who give them their assignments for the day. And one person in each area is assigned to, as they say, catch the trouble for that day. And the dispatchers have those lists. And when they need to call someone out to an emergency, they look at the person who's been assigned to catch the trouble. They don't say, oh, we need someone who can do X. The field employees all basically do the same thing. And they don't evaluate their separate individual skills when calling them out. So that was just one thing I wanted to address. So independent judgment turns on a managerial sort of evaluating the skills. What's the best case that says . . . Oakwood. Oakwood. Oakwood? Yes. But it wasn't a change from pre-existing law, though, was it? It was just a reiteration? Well, that's, yes. I think it was. It was a reiteration of existing law. What about my question, which is that if we have a ULP as of 2006, how could the scope here . . . have you thought about that? I have not, Your Honor. They haven't raised it, right? No. They have not raised it. But it's a difficult issue. It . . . you know, as you presented, I cannot deny it's a difficult issue. But I have not . . . I'm not prepared to address it at this time. No, and that's fair. If . . . No, it hasn't been urged. I just . . . Okay. All right. It's an interesting question. I'd also like to respond to the plaintiff's . . . I'm sorry, the petitioner's argument about latches. They say in their reply brief at . . . sorry, they didn't bring it with me, but it's at the very last pages, I believe, that there's . . . they may be subject to monetary damages. That would be their prejudice. There's no . . . that's completely speculative. There's no showing in this case that the employer will suffer any monetary damages. There's no showing that it will have to make up salaries to these dispatchers. They moved them into a supervisory position. They likely enhanced their salaries and their benefits, as has been done at other companies. When . . . Lose overtime? Is that . . . Yeah, they lose overtime, but typically their salaries are enhanced when they move into the . . . They're marginally enhanced, but then they would have made more on overtime. Is that basically . . . Well, that's all speculation here, but that certainly is the . . . are the facts in another case on the same facts here. So I see that my time is up. I was going to address the validity of Oakwood . . . You've got three more minutes. Oh, I'm sorry. I'm looking at this silly red light. Well, I guess I'd like to address the validity of Oakwood, if the Court needs to hear that. The validity of Oakwood . . . Whether . . . Which test . . . We wouldn't give deference, as we didn't in Gulf States . . . Right. Whether . . . Because it wasn't reasoned enough. Yeah, the question is, does . . . as Petitioner argues . . . Has any Court not given deference to Oakwood? No, Your Honor, and in fact, the First Circuit, I think, put it best when it said that they . . . I'm sorry, I can't think of the word. But sort of the First Circuit and our Court have been sort of at odds for quite some time. Is that fair to say? That is fair to say, but that's because the trouble that the Courts . . . as you pointed out earlier, the Courts and the Boards . . . the Board have been going back and forth over how do you define responsible direction as it applies to charge nurses and then secondarily to electric system dispatchers. That's been an argument that's gone back and forth . . . I mean, I would say . . . and maybe I don't usually ask hypotheticals because I . . . there's usually an obvious distinction, but what about cab dispatchers? I assume they work off lists. Whose call came first? Yes. I think the Board typically finds that dispatchers who dispatch drivers, et cetera, are not supervisors. Because they have standard operating procedures that tell them who to go . . . Who's next? Yeah. Who's up for . . . The veneer here and in the nurse-type category is everyone feels this is really vital and after Katrina, you sort of hope my house will get the power put back on first. Maybe it's just up to the dispatcher. Well . . . That's sort of the veneer here. Even assuming that . . . and I disagree. I think the testimony of Tony DeLotta, who was the only dispatcher to testify, says that usually we work the outages in the order of the greatest outage to the least outage. As you'll know, if you were ever in a section where you only had eight houses out, you're the last one to get power back on. He . . . and again . . . Okay. Because this is helpful. Tony DeLotta will look at that. What about Scott and East? They didn't give any . . . I don't think they ever countered that. They didn't put a dispatcher on the stand. They put a manager who was a former field employee. The only person who could have testified to that with authority was a dispatcher. The only dispatcher who testified said, it's common sense. We take the biggest . . . we work the biggest outages to the smallest outages. Plus there are some emergency people that they have to work in there, but that's known. It's known by all the dispatchers, and it's common sense, frankly, as well. Does the Board have any other . . . does the Court have any other questions for me? No. Because I was going to address whether Oakwood was setting the law, but it doesn't seem to be an issue. Thank you very much. We submit that accountability is part of Energy Gulf States. They cited KDFW, specifically cites an example of responsible direction where the purported supervisor was reprimanded for the performance of others in his department. Energy Gulf States also has a corrective action element. Dispatchers are accountable for the time it takes to restore power and require counseling if they manage situations poorly. That's at Energy Gulf States 206. Why didn't you argue that at least if you lose, nothing could predate 2006? If I lose . . . well, that's what NSTAR . . . that's what NSTAR held was that nothing . . . Why haven't you asked? But we contend that Energy Gulf States is still viable. That's your position? Yes, it is. And they adopted . . . they adopted KDFW. Right at the end, your last minute of your argument before rebuttal, you said that remand only aggravates the latches circumstance, and I certainly see that. Absolutely. But you also . . . if there were insufficient findings as to any element, you'd still prefer a remand to have those developed or no? Well, if you find there's insufficient evidence and that a remand is necessary, you know, we've had one remand in this case. Are you asking for that as to, say, assignments? Well, assignment to a place was, you know, is not contested. That's conceded. Assignment to a place and in multiple outage . . . Do you accept her description of the board's opinion that's on review by us that it does not discuss and decide that there wasn't independent judgment because there isn't this credentialing assessment? I don't think the board decided independent judgment in our case. Okay. So, one attorney said it's implicit, another one maybe agrees with you that it didn't. No. So if it didn't decide it, what . . . is it your opinion that that issue, that narrow issue would have to be remanded or does that make you . . . Well, if you agree with us that the assignment to a place is conceded, then it has to be done with independent judgment and there's no finding . . . Not if it's not conceded. Not that it might not. I don't . . . I mean, if it's . . . I haven't seen the record to say they conceded it. I . . . No. What if the board didn't sufficiently address it? They didn't address independent judgment. They conceded assignment to a place in multiple outage situations. Okay. Go on with your argument. Right. Independent judgment, I did address that. We've got linemen, we've got servicemen, we've got troublemen, we've got vegetation crews. They have to decide which people in these multiple outage situations, which people or groups of people can best address these situations. They have different skill sets, so they're comparing that. They're deciding which group of people should go to this particular outage. That isn't the test. I mean, if a tree is down, you send a vegetation person. I thought it was . . . The test would be, I'll pick Steve over John, because I just have more confidence in him. Right. But if you pick a group of Steves in the servicemen to handle a substation situation, rather than a troubleman or a lineman who's out working on lines, then you're judging the . . . you're judging their skills and abilities. But it's a class of people. It's not just . . . Even in Oakwood, we had, in the three rulings, we had one that says charge nurses are supervisors, but then the boards proved how fact-specific this is, because one of the other of the three was, again, charge nurses, and they're not, right? Yes. So you could have utility dispatchers, one yes, one no, and there isn't some deep inconsistency. That's just doing the job. That's doing the fact-specific inquiry. Dennis Dossie was the manager of the dispatchers in 2001 in Energy Gulf States. He testified in that case. Dennis Dossie was the manager of the dispatchers in Energy Mississippi in 2006, under remand. He testified that the dispatchers on Energy Gulf States and the dispatchers in Energy Mississippi have identical duties and responsibilities. They put in the job description from Mississippi Power and Light in 2003, because the bargaining unit people had no job description, so they put in the job description from Energy Mississippi Power and Light in evidence, and Dennis Dossie testified specifically that these job descriptions talked about supervisory responsibility, direction responsibility of the dispatchers. With regard to latches, you know, our main prejudice argument, we argued the back pay in the brief, but that's wholly speculative. She doesn't know that they made more money as a supervisor or not. There's nothing in the record to that effect, nothing at all. She doesn't know what they made when they became supervisors and were taken out of the unit. Kentucky River controls the independent judgment, not Oakwood. Kentucky River is a Supreme Court decision in 2001, and it could not possibly have been responsible for any delay in this case. It was decided in 2001, two years before we filed the petition. We're out of time, Mr. Shuler. Wow. Thank you. Thank you very much.